First I want to explain that this case is about discrimination in employment, discrimination and retaliation. My client was terminated after he engaged in a particular activity that is making a complaint. Within 22 days after making that complaint, he received for the first time the adverse evaluation of less than expected performance for the quarter and then shortly after that he was terminated. What we're saying in this case is that the facts are that my client had performed . . . they are alleging that during the third and fourth quarter that he had performed below expectation, but during the fourth, third and fourth quarter of 2019, he had participated in recovering over $14 million for the company. He had . . . and he was working directly with the chief financial officer, Mr. Bradt Nowell, and not only that, but his performance was that he had reported to Bradt Nowell, who was the chief financial officer, he had participated and received accolades for his services in recovering the $14 million. That was explained and he received a commendation from Bradt Nowell for that. He also received from Bradt Nowell accolades for his services in clearing up multiple accounts. His whole record has been full of outstanding performance from start to beginning. You have to ask your question, why would a company terminate an employee like this? The only reason would be that it was discrimination, it was retaliation. We had asked for . . . we think that he raised enough issues there that raised a fact issue, but we had asked for records pertaining to Zazak and also additional records from emails between Bradt Nowell and himself, which would have corroborated his allegations that he had been assigned work that was of great importance. I think Bradt Bradley, his immediate supervisor, justified his termination because he had given him a project to work on that he never started. I understand that when you say discrimination and retaliation, discrimination in the first instance based upon religion, is that correct? That's correct. He attempted to say a prayer before a meal and was ridiculed or criticized by others at the time. That's the first thing. Also, as I understood it from the comparator, the woman that you all cite as a comparator, you're claiming racial discrimination as well. Is that correct? Disparage treatment. Okay. All right. Disparage treatment because what we want to point out in that particular case is that whereas my client was performing multiple projects and recovered money throughout his  and Barbara Zajac does no projects. None. In fact, the case that they want to bring, the case that they're alleging, the project that they're alleging that he failed to complete, she didn't want to do the project. Let me ask you before. I understand that part of your argument, but the issue that the district judge, I think, cited was timeliness in seeking her records. Can you address that for us and explain to us why that was a timely effort to obtain her work records to cite in the motion for summary or opposing the motion for summary judgment? We had been attempting to get all types of records from them throughout this whole entire time. I want to point out. Can you give us dates in terms of request for production that was filed or if necessary a subpoena? You wouldn't think with the party, but at least the first request for production or even an informal request that you can cite us to a letter or something in the record to demonstrate diligent effort to obtain the records timely. Sure. Yes, sir. The district judge, while you're looking for that, the district judge's comment, I think, was that the effort to obtain that information was so late so as to not be a valid argument. Well, we said our first request for production of documents was sent. February the 4th of 2021. And there was multiple. At that time, we requested everything because it was relevant. After the discussion, there was multiple e-mails in the record that shows where we discussed prior to narrowing. We sent out a second request for production of document. I think you had it May 10th? May 10th. I was just getting to that. And then August 1st. Now, did those specifically request the co-workers' records, or were they just broadly worded? Did they mention the co-workers' records? We, at that time, did not mention the co-workers' records, I will admit. We did not at that time. Okay. On any of these occasions up to the August 1st? Well, up to that point. Okay. What we're asked to do is prove a negative. I understand. Yeah, it's tricky. I understand that. Okay. And we were being sandbagged all the time, you know, for records. We were initially trying to get Brad Nall's records to show the important work that he had been doing for him. When we received the – When you say sandbagged, what do you mean? What did they do? What did they do? You filed a request. We filed a request. They objected, claiming that it was not relevant, that it was overburdensome, that it was, you know. So then you filed a motion to compare? We, in our district, you know, you're encouraged to try and work this out. So we communicated with them, and we tried to narrow it down. They asked, well, why don't you narrow it down to some terms? I mean, that was the first thing we did. That's all in the record where that was attempted. I asked my client what were the projects she worked on, and they gave me some project names, and that didn't seem to work because we didn't get much of the records from that. Then they were objecting to producing records because they said it was sensitive, they wanted a protective order. We didn't think anything justified a protective order. We agreed to the protective order, thinking maybe we could get the records that we were requesting at that point. Still didn't get much. Still didn't get the records. You may have to enter in a protective order. We sent out additional, we sent out three other, two other requests for production of documents, trying to get these records, requested records that would have substantiated the important work that he was doing and that he had not performed below performance. I guess the point is it was clear, what we were saying is it was clear that she didn't know projects because she told Bradley she did not want to work on any projects. In fact, the project that he says that he didn't complete, he was pointing out, I'm working on three projects, my plate is full. Why don't you get Zajac to work on that? Zajac told him she didn't want to work on it. And I just want to make sure I understand, that's in connection with your race discrimination claim. They terminated your claim. Your claim is they terminated him, one, I guess in retaliation for bringing a complaint with regard to the prayer. But then, two, when they said that the termination was because of his poor performance, then you have a comparator whom you said did a lot less work, but was not disciplined, but he got terminated. So then that's a pretext. Well, pretext for several reasons. For one, if they said that he was, his performance was poorly, how do you claim that a person's, an employee's performance is poorly when he is working overtime and on weekends? That's corroborated that he's reported to Brad and all, I'll be working over the weekends to be sure that all the deadlines with respect to the search to cash project are on time and are completed. They're present. They're really present. The records that support your contention that his performance was acceptable, was sufficient, the employer has all those records. Your client doesn't have any records to support. We have none of those records. All those records are contained in the e-mails between himself and Brad and all. They did produce his evaluation records. They finally produced that after some period of time. They did produce some records right after, right in the middle of, you know, after we filed our motion, 56D motion, and before the court ruled, they did submit some records, but we didn't have a whole lot of time for him to go, you know, five years' worth of records to really get it organized, needed more time for that. Because I couldn't do that. He had to go through those records and point out to me, this is what I was doing then, and this supports what I'm claiming here. We didn't have enough sufficient time, but a few records that they did produce, we did find some corroboration of his testimony from the records that they did produce, you know. And I think we were able to show that Brad Nall did praise him and the IT department for clearing up errors, thanked them for the record substantial that they were going to recover the $14 million that Brad Nall had specifically pointed out. This is the most important he has had prior to any other projects. Don't let any other projects come before this. Get this done, you know. And Brett Bradley and Ben Miller knew of his work on this, and they refused to say anything about that. But if they're going to terminate him for failing to complete a project, that Barbara Zajac specifically told them she did not want, or was not going to, you know, she didn't want it. And she didn't even start them. She had no projects, and they refused to, they did not give her any projects to work on. That's our real complaint, that it's disparage treatment. She doesn't do any, but he's terminated for failing to start one when his plate was already full. He didn't have time to start. And he told Bradley that when he attempted to assign the project to him. It's just a pretext to get rid of it. All of the allegations they make are pretexts. They pointed out that, I'm trying to remember all of it, but in my brief, I pointed out each and every one of them where they were either false or not worthy of credence. And I want to point out that the court, as far as it being timely, they cited in their cases several cases that argued that it was untimely. One, firstly, the one is Deimos v. Union Carbide. And I want to point out that all of the cases that they cite, none of them, the majority of these cases do not have a situation in which they do not produce records that would change the outcome of the summary judgment. For example, Jack Up v. Sara Lee Corporation, that's one case. And the court filed that Jack had failed to file an affidavit to support the Rule 56D motion. Mr. Polk, your time has expired. Counsel, if you don't mind, Judge Graves, I'd ask you one question. If you want to respond on your rebuttal time, that's fine. In the blue brief on page 28, you state that Exeter Finance admits that but we don't have a record cite. I was hoping you could provide a record cite for that statement out of the brief. And, again, if you want to talk about it on your rebuttal time, you'll be back up with us shortly. But that's my question. It's page 28 of the blue brief. Well, yes, they do say. Where is it that they admit? I guess is my question. Specifically, I don't have the cite for that right at this moment, but she worked for the same supervisor as my client. She held the same position as my client. She reported to the same—Bradley was her immediate supervisor as well as my client. They all reported to the same people. But you're arguing that as opposed to them admitting either in a formal request for admission or in a pleading somewhere where they state that they concede the point. I think they conceded by stating in their records that she was reported to Brad. In fact, they even point out that when he left, they assigned his duties to her for the first time. Bradley talks about he assigned it to her. But that's after he left. So what the imperative has to be that they're at the same time doing the same job and he gets treated differently. There's no question that that's true and that they are there at the same time. They are doing the same job. In fact, my client has pointed out that when she's off on leave, he has to cover for her. Okay. And that's how he's able to be sure that the records exist that we're talking about. Okay. Thank you. Thank you, Counsel. Thank you. Mr. Hurst. May it please the Court. Good morning. Monty Hurst. I'm here on behalf of Exeter Finance. In my time before the Court, Your Honors, I will be arguing that the District Court correctly denied Mr. Forbus' Rule 56D motion for additional discovery and, two, that the District Court correctly granted summary judgment on Mr. Forbus' retaliation and race discrimination claims. Justice Englehart, our understanding is— Judge Englehart. I'm sorry. Appreciate it, though. Our understanding is that Mr. Forbus has waived his religious discrimination claim that he asserted at the District Court but did not include that in his appeal. So the discrimination claim that he has on this appeal is his race discrimination claim, and he has his retaliation claim. And if I'm given the opportunity to do so, we'd like to address those claims, but I'd like to get right into the Rule 56D motion because it sounds like Mr. Counsel would like to visit with that as well. Mr. Forbus did not diligently pursue discovery in this case. The reason why we cited jacked up, as well as Lilly, is those were two examples of how this very Court affirmed the denial of a 56D motion when the request for the Court's assistance came after a motion for summary judgment had been filed, which is exactly what happened here. His Honor was asking about the sequence of events. This lawsuit was filed— I want to go back to something you said because you said he waived the claim having to do with religion. Is that what you said? Yes, Your Honor, the religious discrimination claim. And so on page 8 of the brief, of the appellant's brief, he says this case presents the issue of retaliation for complaining to HR about racial discrimination and religion. Yes, Your Honor. So he mentioned it. He mentioned that, Your Honor. So how is it that he waived it? He waived the religious discrimination claim, claiming that he was discriminated against as a result of his religion. What he's referring to there is he made a complaint— or he says he made a complaint that he felt was religious-based, and that goes to his retaliation claim. But our reading of his brief does not suggest that he has a religious discrimination claim anymore. He doesn't write about, nor does he include in his issues, that he is appealing the Court's dismissal of the religious discrimination claim as we read it. All right. Counsel, before you begin again, I want to ask you, I mentioned the—or I should say your opponent, Mr. Polk, mentioned three different discovery requests, February 4, May 10, and August 1 of 2021. Do any of those three requests encompass Ms. Zajac's status as an employee? No, Your Honor. My recollection is that he asked for Ms. Zajac's personnel file, or the spreadsheets that were there on the computer under the particular Treasury Department folder, that he first requested that in his second request for production, and then again in his third request for production. But there was nothing in these requests that would encompass, let's say, coworkers who worked under Mr. So-and-so or anything that would, without stating her name, encompass a production of those records. I don't know at this time, Your Honor. The requests that we received were overly broad, and we made the appropriate objections. Mr. Polk is absolutely right that Northern District of Texas, as well as just about any district I've practiced in, does encourage the parties to visit and try to work things out. We visited with Mr. Polk many times, and in fact, after he sent the second request for production, and getting back to the timeline, Your Honor, when he asked for all e-mails, five years' worth of e-mails, between Mr. Forbus and Brett Bradley. It wasn't Mr. Minola, it was Brett Bradley, his supervisor. We, of course, objected, saying that was way overly broad, and there wasn't any relevance, because it's not even disputed at this juncture that he was doing a good job up until quarter three and quarter four of 2019. We are willing to concede that. We always have. We don't agree with some of the facts that are alleged, but those are fact issues, and the point is those aren't before this court. What's before this court is what happened in quarter three and quarter four of 2019. What happened? What happened was Mr. Forbus' performance declined significantly, and that's outlined in our brief on pages 28 to, I believe, 40. And in essence, he was late on a great deal of the items that he was required to perform. He also violated a particular IT issue that he doesn't even address in his brief. He did get an e-mail some weeks before he was terminated praising a well done or something of that nature. Why is that not sufficient for us to find a material issue? Is it just too isolated in the entirety of his work record? So the e-mail I think His Honor is referring to is an e-mail to the entire team saying good job, everyone. He does not have those types of e-mails to him personally in Q3 and Q4, and he was given in discovery all of the e-mails between him and Brad Null, the CFO of Exeter, in 2019 Q3 and Q4. He was more than welcome to and actually did use one of those e-mails in response to the motion for summary judgment. And then back to his request for Brett Bradley's five years' worth of e-mails, Mr. Polk and we conferred, and Mr. Polk provided us search terms. He gave us four search terms and says run these, I'll take those e-mails. Not only did we run those and give him all the e-mails that had those search terms for the entire five years, we actually corrected one of the search terms because we thought he was trying to use one name of a particular project, and we said we think he's referring to this. We added a fifth search term without his even asking to do so. If there was sandbagging going on, that would have been our opportunity to do so. We would have never done that. In fact, we gave him everything that he asked for, but we didn't agree ultimately on Barb Zajac's records, which we would submit are not relevant. Why do you argue she's not similarly situated? Great question, Your Honor. She may report to the same supervisor, but she has different job responsibilities. The only evidence in the record that speaks to this, which is from her very own declaration, says that Ms. Zajac, she did more manual and time-consuming reconciliation reports. Mr. Forbus, on the other hand, did reconciliations that were more repetitious, less time-consuming. This was an agreement that they actually came to, and the reason why is Ms. Zajac, as she would say, is toward the end of her career. She's not looking for a promotion. She wants to keep the job that she's doing, and she does a very good job of it. Mr. Forbus, on the other hand, wanted to take less time for these reconciliations so that he could get special projects and, from his perspective, do a good job on those. What was his job title? Senior treasury analyst. And Ms. Zajac's job title was? I'm not certain what her job title is, but for purposes of this discussion, they could have the exact same job title. They could report to the same person, but their job responsibilities were not the same. And moreover, what makes her even less of a comparator is, in addition to the circumstances, it is also the very items that Mr. Forbus was terminated for, and because of that, she didn't have performance troubles. She wasn't getting evaluated in the same manner as Mr. Forbus. She wasn't late on her projects. And until and unless there is any evidence that not just the circumstances but the actual discipline that came forward, because what Mr. Forbus has to come forward with is not only are these people nearly identical in the circumstances, but how they were treated after being done the same way, that is what he has to show. And there is no evidence in the record that she had any performance issues, let alone she was treated differently as a result of those performance issues. And so back to the motion for additional discovery, though, this lawsuit was filed in July of 20, and October 1, 21, we filed a motion for summary judgment. Eleven days later, Mr. Forbus files a motion to compel. Your Honor, that motion to compel sought the e-mails for the five years between Mr. Forbus and Brett Bradley. We visited with Mr. Polk, and he gave us the search terms. We gave him the e-mails and the search terms in addition to the adding to the loan. He also alleged in the motion to compel that he wanted those Excel spreadsheets that he had saved to the computer for his own folder. We produced those. So then, not long thereafter, Mr. Polk started making informal requests, not even through a motion to compel or not even through a discovery. And so then he files this motion for additional discovery on October 22, which is the very day on which his MSJ response was due. Well, you say he started making informal requests like that's a bad thing. I thought you told me you all are encouraged to get together and work things out, so. We dignified it, Your Honor, and we always had discussions with him, and we produced documents. But the reason why I'm emphasizing . . . So an informal request is . . . there's nothing wrong with that, is it? Apparently . . . were you in the Western District of . . . Northern. The Northern District. But I practice in the Western. Of the congenial district. All right. There's nothing wrong with making an informal request, but my point is we're a year well into a year or after a year after this lawsuit was filed, and the motion for summary judgment had already been filed, and now we're asking. So I'm not necessarily asking about the quality of Mr. Polk and my relationship in talking things out. I'm more talking about the timing of it all, and is it fair to be making those requests. But, Judge Graves, we even still dignified it, trying to work things out just so we wouldn't have to come here today and say, well, they didn't produce these things to me. So the plaintiff's motion for additional discovery seeks those emails between Mr. Forbus and Brad Nall again that we gave to him based on his search terms. And, by the way, that was one of the items that was informally requested. And then he also asked for the work treasury hard drive for Barb Zajac, and that had never been requested in discovery. Then he also asked for the emails between Mr. Forbus and Brett Bradley, his supervisor. Excuse me. Brett Bradley, that's right. And that was in the third request for production. And, again, Exeter produced all emails between Mr. Forbus and Brett Bradley, including the search term or through the search terms that he provided. So even though he was making those informal requests, we're still working with them. But the point is it was too late at that time, and it didn't give us an opportunity other than to produce what we were willing to do. So the district court's denial of Mr. Forbus' 56D motion was appropriate because he just wasn't diligent in pursuing this. And, by the way, he does not argue in his brief that he was diligent, knowing that this issue was going to come up. It was also appropriate, Your Honors, because the decision was not challenged here. It was denied. The motion to compel was denied. And based on the prospect case, which we cite in our brief, it wasn't susceptible of collection within a reasonable time just because it was denied and he didn't appeal it. And number three as to why the district court's decision was appropriate with regard to the 56D motion is Mr. Forbus doesn't show that the additional discovery would influence the outcome of Exeter's motion for summary judgment. Again, the work files and records of Barb Zajac, because she had different responsibilities, that wasn't going to show anything. And let's assume for a moment there's any truth, and Mr. Polk doesn't communicate where it is that Ms. Zajac supposedly refused to do the very things that she was being assigned and go ahead and give them to Mr. Forbus. We don't know where that is in the record either. But to the extent that it's even being alleged by Mr. Forbus, it doesn't matter because Exeter is not even alleging that she was – or Exeter is actually agreeing that Barb Zajac and Mr. Forbus did different things. She wouldn't have been working on those special projects in the first place. So if there was an instance where someone tried to give her a special project and she said, no, I don't do those, then that's exactly the point Exeter's making. And it further shows that these two individuals were doing different things at Exeter. So that's three reasons as to why the district court was proper in denying Mr. Forbus's 56D motion. The second thing I would like to address is that the district court correctly granted summary judgment on the retaliation claim and the race claim. Again, even the religious discrimination claim, assuming that there is an appeal on that. With regard to the retaliation claim, Mr. Forbus did not engage in protected activity. And that is not addressed in his brief either. The court well knows that the standard is objectively reasonable belief that Exeter engaged in an employment practice unlawful under Title VII. And Forbus has this allegation that a coworker said, you believe in God, God's a puppeteer in the sky, there is no God. And supposedly he said this at a company lunch. There's no testimony, of course, other than Mr. Forbus's who said that and will take that as true for the time being. Well, Mr. Forbus, even taking the facts in his light, could not have reasonably believed that the single comment of lunch constituted an unlawful employment practice under Title VII. I'd like to just mention a few cases that came out of this very court very recently. The Turner case, this court found that a supervisor's multiple references to inner city children as ghetto children could not have reasonably been regarded as unlawful under Title VII. In the Fisher case, this court found that a supervisor's repeatedly calling black employees boy could not have reasonably been regarded as unlawful under Title VII. And in the Malin case, this court found that an HR manager's continually describing to a colleague her sexual encounters and showing pictures of them could not have reasonably been regarded as unlawful under Title VII. All of these situations could have been offensive. They could have been inappropriate. They could even be reprehensible. But they were not found to have prompted a reasonable belief to be regarded as unlawful under Title VII. Staying with the retaliation claim, Your Honors, there is not any evidence of a causal connection between the complaint and the termination. There was four months between the time of his alleged complaint and the time that he was terminated in January of 2020. The court is very clear in its case law that the requirement is very close if you're going to look at temporal proximity alone. That comes from Fisher case, the Besser case, and a bunch of other cases, even fairly recently. Fisher tells us, and we cite this in our brief, Fisher tells us that a three- to four-month gap between the time of the alleged protected activity and the time of the adverse employment action was not enough to be considered very close and wouldn't constitute or wouldn't satisfy the requisite for the causal connection. And same with Besser. And actually, the Besser case says that even two-and-a-half months doesn't satisfy the temporal proximity that gets you there for the causal connection. The third thing I'd like to mention, Your Honors, with regard to the discrimination claim, and again, just to mention, Barb Zaback, she is not a comparator. She was not similarly situated. The circumstances and the conduct have to be nearly identical. And the Wallace case tells us that. You made a complaint about the prayer Mr. Forbus did. Was that complaint investigated? Was a record made? What happened in connection with that? Yes, Your Honor, there was an investigation, and there was nothing to corroborate what he had said. No one heard what Mr. Forbus supposedly heard. And I understand that in a summary judgment proceeding, we take the plaintiff's allegations as true. But it is worth mentioning that there was an opportunity to conduct discovery on any of that, to take the depositions of any of these people who Mr. Forbus claims were there at this company lunch. Over what period of time did the investigation occur? A few days? A couple of weeks? How long was it? Your Honor, I don't know exactly how long it took, but I know that the complaint was made shortly after, and I believe the investigation ensued shortly after that. And I believe it got back to Mr. Forbus, who didn't particularly care for the result. And then I'd like to conclude with just mentioning, Your Honors, that there is not one shred of evidence of pretext in this entire record. This is the piece de resistance, or as we say in Texas, here's the meat of the coconut. This is in the Owens and Sakatu case. There's two types of evidence that could be used as pretext. Obviously, there's the comparator evidence, which is not the case here. Then there's also the evidence of the employer's legitimate and non-discriminatory reason is unworthy of credence. That comes from Owens. And so in this particular case, Exeter's reasons for termination were failure to complete critical projects, submission of multiple assignments incorrectly or untimely, and the failure to comply with company policy. And Mr. Forbus's, I see I'm out of time. May I finish my point, Your Honors? Very briefly. Thank you. Mr. Forbus's brief is all over the place as to him addressing any of these, if at all. On one of them, he says the reason why that he didn't submit something timely is because his plate was full, is a good example. Or the reason why he responds to the IT allegation that he didn't comply with the policy of, hey, I never had a problem with IT. It doesn't really address it. And that's kind of typical of what we saw in that brief. None of it shows evidence of pretext. For all of these reasons, Your Honors, we would ask that this court affirm the district court's dismissal of the discrimination and retaliation claims, as well as the denial of the motion for additional discovery. Thank you. Thank you, Mr. Hurst. Rebuttal. We did request Zajac's work records in our request for production of documents. And the reason why we requested the work records was because those work records would show that she had never worked on a single project. Mr. Forbus had to do not only the work task that Zajac was assigned to do, but the projects were extra. So he was doing not only his, the same thing that she was doing, but he was doing in addition projects. And these projects were assigned not by his immediate supervisor, but by the chief financial officer, Brad Nall. And that's why we were asking for the emails to go all the way back, because he was reporting directly to Brad Nall. He was the one who had picked him out after he came up. He came back with an idea that they identified and called the Q, which saved the company thousands of dollars every year, because it reduced the time that they had to spend on doing research. After that is when Brad Nall asked him to start working on various assignments, various projects. Not Brad Bradley. It was Brad Nall. And that's why we wanted to go back and get all those emails to show that relationship. We wanted to, and Barbara Zajac, he did the same thing she had to do in addition to the projects. That's the whole point. And that's why we wanted his work records as well, to show both of those work records, to compare and show that they were doing the same work. We're not going to be able to get testimony from them about this. The other part is, if you've got a company that's retaliating in the manner in which they were retaliating against Mr. Forbes, you know, for making the complaints, everybody else I don't recall. That's the whole point. And no consequences are being brought for terminating him. Within 22 days after he makes his complaint, they come back and give him a bad evaluation. That's the first time he ever got a bad evaluation. That's the first time. And that is timely enough to show relevance. And it's also connected up shortly after that, then they terminate him, because he's still complaining about what's going on there. That's our point. Thank you, Mr. Polk. The court will take this matter under advisement.